## Maddox v. Rowe, Assignee.

(Decided June 17, 1913.)

### Appeal from Ohio Circuit Court.

1. Finding of Chancellor.—The chancellors' finding of fact will not be disturbed on doubtful evidence.

2. Mortgages—Executed by Married Woman to Secure Debt of Husband.—A mortgage executed by a married woman to secure a debt of her husband, will not be adjudged unenforcible on the ground that it was procured by fraud, coercion or duress, when the mortgage was executed intelligently three days after the transactions in which it was charged that the coercion was exercised, and no claim of coercion was made until after the mortgage had passed into the hands of a purchaser with the acquiescence of the married woman in its validity.

BARNES & SMITH for appellant.

HEAVRIN & WOODWARD for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE HOBSON—
Affirming.

J. B. Maddox was president of the Bank of Centre-town, and while such had fallen in debt to the bank between $5,000 and $6,000; on January 26, 1911, he and his wife, Mecie Maddox, executed to the bank a mortgage on the property of the wife to secure this indebtedness. This suit was brought to enforce the mortgage; Mrs. Maddox defended the suit insisting that the mortgage was obtained from her by duress, fraud and coercion. A large mass of testimony was taken; on final hearing the circuit court entered judgment enforcing the mortgage. She appeals.

The facts of the matter are about these: J. B. Maddox was a merchant in the town of Centertown. Several years before the year 1911, he had a severe attack of typhoid fever, which left him in a very bad condition of health so that he had to go to a sanatorium. While he was gone his business was run by his brother, his niece and his daughter. When he returned from the sanatorium he found his affairs in very bad condition. He had in his own name 13 shares of stock in the bank of Centertown. This stock had been purchased with the money of the wife, but she had allowed her husband to put it in his own name to give him credit. He was the president of the bank and in his efforts to extricate himself from his financial difficulties, created the debt to the bank above referred to. He transferred to his wife eight shares of the bank stock and retained five shares in his own name. But to pay her for these five shares, he and she made a note to the bank for $500, and this money was placed to her credit in the bank as a time deposit at 5 per cent. She also signed as the surety of her husband another note for $750; for money which he borrowed and used himself. She was not on any of his other paper to the bank. About January 20, 1911, a State Inspector made an examination of the bank and reported its condition to the Secretary of State, who ordered the bank cashier on January 22 not to open the bank again. Before this notice was given by the State Inspector, he had a conference with certain persons at Beaver Dam, and reports of what had taken place at this conference were circulated to the effect that the Secretary of State had determined to prosecute the officers of the bank for violation of the State banking laws. On the afternoon of January 23, there was a meeting of the stockholders of the bank at the house of the cashier. Maddox and wife were present; also Messrs. Heavrin and Woodward,

who had been invited to be present by some of the persons interested. After a list of the stockholders had been written out, one of the attorneys made a speech to the stockholders in which he in substance said that the banking laws had been violated by the officers of the bank, but that if each of the officers would make good what he had drawn out of the bank, he did not think any prosecutions would be instituted; that he could not guarantee this however, but that it would be greatly to the interest of the community and to the interest of the stockholders if each officer would secure what he owed. Maddox said that he would give up all his property and Mrs. Maddox said that she would stand by her husband and protect his honor with all that she had. Dr. Chapman, a director in the bank, owed it about $10,000. After Maddox and wife had agreed to secure the bank in what he owed, Chapman's son said that he would see his father, who was sick, and see what he could do. He went to see his father and the result was that he also agreed to execute a mortgage. After this the stockholders agreed to place the bank in the hands of Alvin Rowe. Alvin Rowe was sent for and agreed to accept the trust. A resolution of the stockholders was then drawn up and signed, by which Alvin Rowe was selected as fiscal agent to liquidate the affairs of the bank under the direction of the Secretary of State, and he was requested to give each officer an opportunity to make good any loss arising through the fault of such officer, in default of which the body demanded prosecution of any person whose liability was established, and who refused to make same good to the bank. There is some contrariety in the evidence as to who suggested the latter part of the resolution, the proof for the plaintiff being that Maddox suggested that as he and Dr. Chapman were fixing up their matters, this should be put in so that all the other officers would do likewise. The proof for Mrs. Maddox is that her husband did not make this suggestion and that the attorney drew the resolution in this way without any suggestion from others. The meeting then adjourned. The attorneys returned to Hartford and drew the mortgages which were to be executed by Maddox and wife and Chapman and wife. The papers were sent to Centertown on January 26th, and were on that day executed by Chapman and wife, and Maddox and wife. After this Alvin Rowe took charge of the bank and organized a new corporation styled the Farmers Bank of Centertown; and this bank some months

later took over the assets of the old bank, and assumed its debts. Up to the time that the new bank did this, Mrs. Maddox had in no manner complained of being over-reached in the execution of the mortgage, and she made no such claim to the new bank until some time in August when the bank applied to her to close the matter up by deeding to it the property, as the debts exceeded the value of the property. She then insisted that there was a debt of $1,000 which her husband's brother ought to pay as he was surety on the note and the bank not agreeing to this, she employed an attorney and denied liability. This suit followed.

The proof for her shows that she was in great distress on January 23d, when the meeting of the stockholders was held; that her husband had been in a very bad state of mind for several days, and that she was very apprehensive that he would be prosecuted, and feared that if he was prosecuted he might be sent to the penitentiary. She did not know that she was not bound to pay the note which she had signed as surety for her husband, and it is insisted that she executed the mortgage without consideration under a palpable mistake of law and under the coercion of the threats that her husband would be prosecuted. If the mortgage had been executed on January 23d, there would be more force in this; but the mortgage was not in fact executed until three days later and all the parties had had sufficient time to recover their usual frame of mind. The evidence shows that she was not in an abnormal condition at all when the mortgage we executed, and that she perfectly understood what she was doing. She did not execute the mortgage to secure merely the notes which she had signed as suerty for her husband; she executed it to secure all his indebtedness to the bank, and, as she expressed it, to save his honor. She understood that the Farmers Bank was being formed, and knew that it was proposing to take over the assets of the old bank. She knew that the mortgage which she and her husband had executed was one of the considerations for the new bank taking over the affairs of the old bank; and although several months elapsed before this scheme was carried into effect, she at no time claimed either to Rowe as agent of the old bank or to the officers of the proposed new bank that the mortgage which she had executed was invalid. On the contrary she stood by and allowed this arrangement to be consummated without any notice of such a claim on her part, and

manifestly during this time she was laboring under no excitement ·or coercion. The mortgage was not executed to compound a criminal prosecution. Before the new bank took over the affairs of the old bank she and her husband had several conferences with Rowe about their matters, but in none of them did either of them claim that the wife had been overreached in the execution of the mortgage, or that it was invalid for any reason.

The question raised by the appeal is simply one of fact. We give some weight to the finding of the chancellor on a question of fact, and we do not disturb his finding where the evidence is conflicting and the truth doubtful. Under this rule we do not see that we can disturb the chancellor's finding here. On the contrary we think his finding is supported by the weight of the evidence.

Judgment affirmed.